**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------x

YUGE ZHANG,                                    :
                                               :
                  Plaintiff,                   :
                                               :
                                               :        Civil Action No.: 1:26-cv-6909
       v.                                      :
                                               :
DALON GADSON                                   :
                                               :
                  Defendant.                   :
                                               :
--------------------------------------------------------------x

Plaintiff Yuge Zhang ("Zhang" or "Plaintiff"), by his attorneys, DGW Kramer LLP, for

his Complaint against Defendant Dalon Gadson ("Gadson"), alleges as follows:

## NATURE OF THE ACTION

1.     This action arises from two related courses of intentional misconduct by

Defendant Dalon Gadson—first, domestic violence committed in private, and then a calculated

effort to reverse the parties' roles through false accusations broadcast to the public.

2.     The first occurred on April 4, 2025, when Gadson physically attacked his then-

husband, Plaintiff Yuge Zhang, inside their home in Queens. Gadson threw objects at Zhang,

pinned him to the floor, pressed his fingers against Zhang's neck hard enough to leave visible red

marks, and threatened to kill him. The attack resulted in a two criminal counts against Gadson

and a temporary order of protection directing Gadson to stay away from Zhang and refrain from

contacting him.

3.     Terrified by the attack and concerned for his safety, Zhang promptly sought a

divorce from Gadson. Zhang moved out of their home and ultimately left the United States to

return to China, placing thousands of miles between himself and his abuser.

4.      Although Zhang now lives in China, he maintains close friendships and other meaningful personal and professional relationships in the United States and remains in regular contact with those individuals.

5.      Through those relationships, Zhang learned of Gadson's second course of misconduct. In a brazen and fabricated rewriting of history, Gadson used his public social-media account to cast himself as the victim and Zhang as the abuser. Among other falsehoods, Gadson accused Zhang of strangling and physically assaulting him—the very type of violence that Gadson had inflicted upon Zhang and that had led a criminal court to issue an order protecting Zhang from Gadson.

6.      Gadson first published the defamatory video on July 13, 2026. After that publication was removed or taken down, Gadson deliberately republished the same false story on August 10, 2026, thereby communicating the defamatory accusations to a new and vastly expanded audience. As of 5:00 PM August 12, 2026, the republication had accumulated at least approximately 181,000 views, nearly 9,000 likes, 629 comments, 484 reshares, and 6,305 direct sends. The August 10, 2026 video labeled itself as "Pt 1." On August 12, 2026, Gadson posted a second video. In that video, Gadson again falsely accused Zhang of strangling him and added that Zhang had devised a "premeditated" scheme to make a false police report, cheated throughout their marriage, sought to preserve his green card through the marriage, destroyed Gadson's property, and choked Gadson during a physical confrontation. By 5:00 p.m. that same day, the second video had already garnered at least 689 likes, 81 comments, 20 reshares, and 261 direct sends. Through this escalating series of publications, Gadson repeatedly recast the victim of his own domestic violence as the aggressor and broadcast that fiction to an immense and continually expanding audience.

7. Through these three separate publications and their widespread dissemination, Gadson transformed a private act of domestic violence into a public campaign against its victim, causing immense and continuing harm to Zhang's reputation.

## PARTIES

8. Plaintiff Yuge Zhang is a citizen and subject of the People's Republic of China and is presently domiciled in China. Before returning to China, Zhang lived in New York, where he established significant personal and professional relationships that he continues to maintain. Zhang's marriage to Gadson, the parties' shared residence, the April 4, 2025 attack, the resulting police response, and the ensuing criminal proceedings and order of protection were all centered in New York. Although Zhang is lawfully admitted to the United States for permanent residence, he is not domiciled in New York or in the same State as Gadson.

9. Defendant Dalon Gadson is a citizen of the United States domiciled in the State of New York, New York County.

## JURISDICTION

10. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(2) because the action is between a citizen or subject of a foreign state and a citizen of a State, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

11. The amount in controversy exceeds $75,000 because Zhang seeks aggregate compensatory and punitive damages for Gadson's intentional assault and battery, including physical pain, injury, fear, and emotional distress, and for Gadson's repeated defamatory publications, including presumed and actual reputational damages, humiliation, and emotional distress.

12.     This Court has personal jurisdiction over Gadson because Gadson is domiciled in New York and because the claims arise from conduct committed in New York.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Gadson is the sole defendant in this action and resides in the Southern District of New York. Gadson is domiciled in New York County and therefore resides in this District for venue purposes. See 28 U.S.C. §§ 112(b), 1391(c)(1).

### THE APRIL 4, 2025 ASSAULT AND BATTERY

14.     On April 4, 2025, Zhang and Gadson were living together at 45-14 11th Street in Long Island City, Queens.

15.     By then, their relationship had become deeply strained. Throughout much of the time they lived together, Gadson was only employed part-time and contributed little to the upkeep of their home. Zhang was left to shoulder both the financial responsibility for the household and the day-to-day burden of maintaining it.

16.     Over time, that imbalance and the resulting friction caused the relationship to deteriorate.

17.     On the evening of April 4, 2025, Zhang and Gadson became involved in a verbal argument. The argument started as an issue of money. Gadson did not have a full-time job and wanted money. Just a few days prior, on April 2, Gadson emptied out the couple's savings in their joint account, containing about $10k, and moved all those funds into his own personal account. This was already upsetting and distressing to Zhang and so when Gadson demanded more money, Zhang refused.

18.     Rather than accept Zhang's response, Gadson chose violence.

19. He went into the bathroom, gathered the rugs and trash can, and began throwing them forcibly at Zhang. Gadson then seized a cabinet and hurled it towards Zhang. The projectiles missed Zhang but hit with such force that it shattered next to Zhang. Meanwhile, Zhang was Facetiming his mother, and Gadson knocked over his phone and at that point, Zhang's mother called the landlady for assistance.

20. Zhang did not respond in kind. He retreated upstairs, attempting to put distance between himself and Gadson. A roommate witnessed at least part of Gadson's outburst. But Zhang's effort to disengage did not end the confrontation.

21. When Zhang later attempted to the bedroom to again put distance between himself and Gadson. Gadson reached the door before him. Gadson, who was much physically larger and imposing than Zhang easily overpowered Zhang and pinned him to the floor, leaving Zhang trapped beneath the man with whom he still shared a home.

22. With Zhang immobilized beneath him, Gadson made Zhang fear for his life, saying "I am going to fucking kill you."

23. Gadson then pressed his fingers into Zhang's neck. The pressure caused Zhang immense pain and left visible red marks. The attack also left Zhang with multiple scratch wounds in different places on his body.

24. Zhang had not threatened Gadson, did not consent to the contact, and had done nothing that justified Gadson's use of force. What Gadson had asked for was an honest answer about whether their friendship could survive the divorce. When Zhang gave him one, Gadson answered with violence. Zhang repeatedly attempted to create space between himself and Gadson in a futile effort to de-escalate. In response, Gadson placed Zhang in fear for his life.

25.     Zhang eventually managed to get away. Shaken and afraid that Gadson would attack him again—or carry out the threat he had just made—Zhang waited till Gadson left the house and locked all doors while calling 911. When Gadson returned, he found the doors were locked, so he went around the house and broke in through the window. Zhang fled the residence and sought refuge at a nearby restaurant. He remained there, in a public place and away from Gadson, until police arrived. Zhang was forced to dial 911 to seek emergency police assistance and intervention.

26.     Zhang then reported what had happened and executed a signed supporting deposition describing the attack. He told law enforcement that Gadson had thrown objects at him, pinned him to the floor, threatened to kill him, and pressed his fingers against Zhang's neck. Zhang showed the responding officers his injuries. The responding officers documented the marks on Zhang's neck with visible redness.

27.     The consequences were immediate. Two days later, on April 6, 2025, the Queens Criminal Court issued a temporary order of protection in *People v. Gadson*, Case No. CR-013097-25QN. The order identified a charge against Gadson under New York Penal Law § 121.11 for criminal obstruction of breathing or blood circulation, a class A misdemeanor.

28.     The court ordered Gadson to remain at least 100 yards away from Zhang, Zhang's home, and Zhang's workplace. Gadson was prohibited from contacting Zhang directly, electronically, or through third parties and was directed to refrain from assaulting, harassing, threatening, strangling, or obstructing Zhang's breathing or blood circulation. The order remained in effect through April 5, 2026.

29. Zhang initially wanted a 2 year order of protection, but learned that obtaining one would leave a stain on Gadson's record. Zhang agreed to seek only a 1 year order of protection on the condition that Gadson agreed to take anger management classes.

30. Following the issuance of the order of protection, Gadson moved out of the parties' home. For Zhang, the attack extinguished any remaining possibility that the marriage could be repaired. What had previously been a painful recognition that their relationship was ending had become an urgent need to sever his legal ties to the person who had attacked him and threatened his life.

31. Zhang therefore moved promptly to commence divorce proceedings against Gadson. The divorce action was filed soon after the attack and, following the ensuing legal proceedings, was eventually granted.

32. Following the divorce, Zhang moved back to China, putting an ocean between himself and his abuser, thinking the matter to be closed and done with.

33. In a June 11, 2026 message to Zhang Gadson admitted responsibility for the confrontation and the harm he had caused. Gadson acknowledged that he had "succumbed to anger and allowed it to fuel [his] decisions" and told Zhang: "I want to apologize for my anger. I am sorry for starting the fight, and I am sorry that the last thing you may have seen was someone you may have loved bring harm towards you."

34. While the sentiment was warm and affectionate, it did not erase Zhang's trauma and the fear he felt that night.

35. Nevertheless, Zhang was ready to move on with his life and put the whole situation behind him.

## GADSON'S FALSE AND DEFAMATORY PUBLICATIONS

36. A year following the divorce, Gadson began using his public Instagram account to turn the parties' marriage and its dissolution into social-media content. Gadson operates that account under the handle **@akadaydaygadson**, through which he had amassed approximately 18,400 as of 5:00 PM August 12, 2026.

37. The reach of Gadson's account extended far beyond those followers. In one post, Gadson celebrated the end of the marriage beneath the text "My divorce papers came in." That post, dated December 13, 2025, received approximately 4.9 **million** views. Gadson thus knew that content concerning his divorce from Zhang could attract an enormous public audience.

38. It was likely that Gadson, seeing the popularity of that video, decided to make additional videos capitalizing on other people's dissatisfaction with their marriages to generate viral content and views for his own aggrandizement.

39. Against that backdrop, on July 13, 2026, Gadson published a video titled "Divorcing My Ex-husband Pt 1" through the @akadaydaygadson account (the "Video"). Far from merely announcing or discussing the divorce, Gadson used the Video to launch a sensational and purportedly factual account of the parties' marriage—one in which Gadson cast himself as the victim and Zhang as a violent abuser and criminal.

40. Gadson opened the Video with an extraordinary series of accusations:

"My ex-husband strangled me, called the cops on me claiming I attacked him, served me divorce papers that went against our prenup, then fled the country because he had dirty money from his father, who was laundering money from the government, who received the death penalty. This is my ex-husband, Yuge Zhang."

41. Gadson then suggested that Zhang had assumed false identities, stating: "You probably know him as Leslie or Paul, depending on the persona he wanted to show you."

42. Gadson made clear that these accusations were intended as the beginning of a broader series. He told viewers: "This timeline is important because I will be giving details on

how he physically assaulted me, berated me, cheated on me, lied to me about his identity and his family, and much more throughout this series."

43.    Gadson did not present these statements as speculation, opinion, or rhetorical exaggeration. He claimed personal knowledge of the events, described them as matters that had actually occurred, and promised his audience additional "details" supporting his accusations.

44.    Nor was there any genuine ambiguity about the person Gadson was accusing. Gadson identified the subject as his ex-husband, displayed Zhang's image or likeness, used a Zhang's name, and supplied biographical details that identified him. Reasonable viewers—including individuals who knew Zhang and his relationship with Gadson—understood that the Video concerned Zhang.

45.    Following posting of the video, strangers began requesting to follow Zhang's Instagram, which was private, but easily searchable using Zhang's real name.

46.    The Video's central accusation was not merely false; it inverted the truth. Zhang never strangled, assaulted, or otherwise attacked Gadson. It was Gadson who had pinned Zhang to the floor, pressed his fingers against Zhang's neck, threatened to kill him, and become the subject of a criminal charge and an order of protection.

47.    The remainder of Gadson's narrative was likewise fabricated. Zhang did not possess "dirty money," benefit from government funds obtained through money laundering, or leave the United States to evade responsibility for financial crimes. Zhang's father did not launder money from any government, was not sentenced to death, and did not provide Zhang with criminal proceeds.

48.    Gadson's statements that Zhang used the names "Leslie" or "Paul" as deceptive "personas," and that Zhang lied about his identity and family, were also false and misleading. In

context, those statements were calculated to portray Zhang as dishonest, manipulative, and engaged in an ongoing effort to conceal who he was.

49.    The Video further conveyed the false implication that Zhang had fabricated a report of domestic violence, falsely accused Gadson of attacking him, and manipulated the police and courts to conceal his own supposed abuse. The police report, criminal charge, and order of protection reflected the opposite: Zhang reported Gadson's attack, and Zhang was the person whom the criminal court ordered Gadson to stay away from.

50.    The July 13 publication was subsequently removed or taken down. But Gadson did not allow the false accusations to end there.

51.    On August 10, 2026, Gadson deliberately republished the Video as an Instagram Reel through the same @akadaydaygadson account. By posting it anew, Gadson repeated every accusation and communicated the same false narrative to a fresh audience, thereby defaming Zhang a second time.

52.    The republication spread rapidly. As of 5:00 PM August 12, 2026, the Video had accumulated at least approximately 181,000 views, nearly 9,000 likes, 629 comments, 484 reshares, and 6,305 direct sends.

53.    Those figures capture only the minimum dissemination documented as of August 11, 2026. Each reshare and direct send placed the Video before additional viewers, while the public Reel remained available to Gadson's followers and the broader Instagram audience.

54.    Gadson therefore did more than tell a lie about Zhang. He took the violence that he himself had committed, assigned it to his victim, surrounded that role reversal with additional accusations of fraud and criminality, and broadcast the resulting fiction to more than one hundred thousand people.

55.    By disseminating this video, Gadson's own popularity shot up significantly and the number of followers significantly increased by hundreds.

56.    The Video is self described as "Pt 1." On August 12, 2026, Gadson published a second video (the "Second Video").

57.    Rather than retreat from his false accusations, Gadson capitalized on the extraordinary attention they had generated. On August 12, 2026—just two days after republishing the first Video—Gadson published a second video through the same @akadaydaygadson Instagram account (the "Second Video").

58.    The Second Video purported to tell the story of the April 4, 2025 incident in greater detail. Gadson opened by repeating his central falsehood and adding a new accusation of calculated deception:

> "This is the story when my husband strangled me and called the cops on me. For context, we lived in a brownstone. I had no idea his scheme to call the cops was premeditated, and I was undeniably blinded by love at this time."

53.    Gadson thereby accused Zhang not only of strangling him, but also of devising a premeditated scheme to make a false police report and frame Gadson for an assault that Gadson supposedly had not committed.

54.    Gadson then supplied a purported motive for the breakdown of the marriage, stating:

> "In March twenty twenty-five, I asked my ex-husband for a separation. I explained that the separation was because of how he was treating me and that I caught him cheating throughout the marriage."

55.    Gadson coupled that accusation with Zhang's immigration status, stating that he had not wanted to divorce Zhang "because that would revoke his green card" and because Gadson supposedly "didn't wanna ruin his life."

56.    In context, Gadson portrayed Zhang as an unfaithful and abusive spouse whose ability to remain in the United States depended upon preserving the marriage—and portrayed himself as the magnanimous spouse who had remained married only to protect Zhang's immigration status.

57.    Gadson next offered a fabricated account of the physical confrontation. Gadson admitted that he "thr[e]w a towel in [Zhang's] direction," but then falsely claimed that the encounter escalated into the parties "throwing objects and furniture at each other."

58.    Gadson mocked Zhang's cries for help as a calculated performance. He claimed that Zhang crossed his legs and began screaming in a high-pitched voice while maintaining a "neutral, calm facial expression." Gadson further claimed that Zhang then ran upstairs yelling "Help me" because Zhang intended to damage property or harm Gadson's turtles—conduct that Gadson asserted Zhang actually committed.

59.    Gadson then accused Zhang of forcing his way into a room, initiating a wrestling match, somehow magically positioning himself on top of Gadson, and calling for someone to contact emergency services as part of his supposed scheme.

60.    Gadson concluded the Second Video by again falsely accusing Zhang of strangulation, stating:

> "He got further on top of me and began choking me. He suddenly stops. His entire facial expression just goes neutral. He gets up and just walks downstairs to our bottom entrance."

61.     These accusations were false. Zhang did not strangle, choke, assault, or otherwise attack Gadson. Zhang did not initiate a wrestling match, destroy Gadson's property, harm Gadson's turtles, or stage cries for help as part of a plan to frame Gadson.

62.     Zhang also did not devise any "premeditated" scheme to make a false police report. Zhang repeatedly attempted to disengage from Gadson and create distance between them. He called for help and later contacted the police because Gadson had thrown objects at him, overpowered him, pinned him to the floor, threatened to kill him, and pressed his fingers into Zhang's neck.

63.     The physical evidence and ensuing legal proceedings reflected what actually occurred. Responding officers documented Zhang's scratches, neck pain, and visible redness; Gadson was charged with criminal obstruction of breathing or blood circulation; and the Queens Criminal Court issued an order protecting Zhang from Gadson—not the other way around.

64.     Gadson's accusation that Zhang cheated "throughout the marriage" was also false. His statements concerning Zhang's green card further conveyed the false and defamatory implication that Zhang had used Gadson and their marriage to obtain or preserve an immigration benefit.

65.     As with the first Video, Gadson presented the Second Video as a factual account based on his personal knowledge. He did not frame his accusations as opinion, speculation, or an uncertain recollection. He supplied a detailed chronology, attributed specific conduct and motives to Zhang, and asserted that the events had actually occurred.

66.     Gadson knew that the accusations were false because he had personally participated in the April 4, 2025 incident. He knew that he—not Zhang—had initiated and

escalated the violence. He also knew that Zhang's police report was not a premeditated scheme because Gadson had been charged as a result of the incident and had been personally served with the order of protection naming Zhang as the protected party.

67.     By 5:00 p.m. on August 12, 2026, the Second Video had already garnered at least 689 likes, 81 comments, 20 reshares, and 261 direct sends. Those figures reflect only the minimum dissemination documented within hours of publication, while the Second Video remained available to Gadson's thousands of followers and the broader Instagram audience.

68.     The Second Video was not a clarification or correction. It was an escalation. Having already broadcast the false accusation that Zhang strangled him, Gadson supplied a more elaborate narrative designed to make the lie appear credible, to portray Zhang's genuine cries for help as calculated theater, and to recast Zhang's truthful report of domestic violence as a criminal scheme.

69.     Gadson knew that the story he was telling was false. In a June 11, 2026 message to Zhang—merely a month before publishing the Videos—Gadson admitted responsibility for the confrontation and the harm he had caused. Gadson acknowledged that he had "succumbed to anger and allowed it to fuel [his] decisions" and told Zhang: "I want to apologize for my anger. I am sorry for starting the fight, and I am sorry that the last thing you may have seen was someone you may have loved bring harm towards you."

70.     Gadson's contemporaneous admission cannot be reconciled with the story he later broadcast to the public. In private, Gadson apologized for starting the fight and harming Zhang. In public, Gadson reversed their roles, accused Zhang of initiating a premeditated scheme, and falsely portrayed himself as the victim of strangulation. That contradiction demonstrates that

Gadson's accusations were not the product of mistake, confusion, or imperfect recollection: Gadson published them with actual knowledge of their falsity.

## GADSON'S KNOWLEDGE, ACTUAL MALICE, AND THE HARM TO ZHANG

71.     Gadson knew that his accusations were false. He was not repeating information obtained from another person, interpreting an ambiguous record, or attempting to reconstruct events that he had not witnessed. Gadson personally participated in the April 4, 2025 confrontation and knew that he—not Zhang—had initiated and escalated the violence.

72.     Gadson also knew what followed the attack. Zhang reported Gadson's conduct to the police; responding officers documented Zhang's injuries; Gadson was charged with criminal obstruction of breathing or blood circulation; and the Queens Criminal Court issued an order of protection naming Zhang as the protected party.

73.     Gadson was present when the order of protection was issued, was advised of its contents in court, and was personally served with it. He therefore knew that the official response to the incident was directed at protecting Zhang from Gadson—not Gadson from Zhang.

74.     Gadson's private admission removes any possible doubt about his knowledge. Before publishing the Videos, Gadson apologized to Zhang for allowing his anger to control his actions, for "starting the fight," and for bringing harm to Zhang.

75.     Yet, when Gadson addressed the public, he told the opposite story. He accused Zhang of strangling him, portrayed Zhang's genuine calls for help as staged, and recast Zhang's truthful police report as a "premeditated" scheme to frame Gadson.

76.     This was not a single statement made impulsively in the immediate aftermath of a contentious encounter. Gadson waited more than a year after the attack before publishing his accusations. When the July 13, 2026 publication was removed or taken down, Gadson deliberately republished it on August 10, 2026. Two days later, as the republication continued to spread, Gadson released the Second Video and supplied an even more elaborate version of the same fabricated story.

77.     At each step, Gadson had the opportunity to stop, correct the record, or tell the truth. Instead, he repeatedly chose to expand and amplify accusations that he knew were false.

78.     Gadson also knew the magnitude of the audience he was addressing. His Instagram account had approximately 18,400 followers, and an earlier post celebrating the divorce had received approximately 4.9 million views. Gadson therefore knew that accusations concerning Zhang and the divorce could spread far beyond his existing followers.

79.     The accusations did exactly that. By 5:00 p.m. on August 12, 2026, the August 10 republication had accumulated approximately 181,000 views, nearly 9,000 likes, 629 comments, 484 reshares, and 6,305 direct sends. Within hours of its publication, the Second Video had already received at least 689 likes, 81 comments, 20 reshares, and 261 direct sends.

80.     Each view communicated Gadson's accusations to another person. Each reshare and direct send carried them into additional social circles and private conversations beyond Zhang's ability to identify, monitor, or correct. The public nature of the Videos also left them capable of continued dissemination to an ever-expanding audience.

81.     Although Zhang returned to China following the breakdown of the marriage, he did not abandon the life or reputation he had built in New York. Zhang continues to maintain

close friendships and meaningful personal and professional relationships with individuals in New York and remains in regular communication with them.

82. The Videos concerned events that occurred almost entirely in New York. They purported to describe the parties' marriage and shared residence in New York, the April 4, 2025 confrontation in Queens, Zhang's report to the New York City Police Department, the resulting New York criminal proceeding, and the parties' subsequent divorce.

83. Gadson is domiciled in New York and used his public Instagram account to disseminate the Videos while residing in New York. The defamatory narrative therefore originated with a New York resident, concerned conduct and legal proceedings occurring in New York, and was directed in substantial part toward individuals familiar with the parties' life and marriage in New York.

84. The publications reached individuals who knew Zhang from New York and who could readily identify him from his name, photograph, relationship to Gadson, and the biographical details disclosed in the Videos. Following publication, strangers began requesting access to Zhang's private Instagram account, which was readily searchable under his real name. People who knew Zhang from New York both saw, and shared the Videos and have been talking about the Videos since they were disseminated.

85. Gadson's accusations consequently caused reputational injury not merely in the abstract or solely in China, but within the New York community in which Zhang had lived, formed relationships, and established his reputation. The Videos placed Zhang's standing among his New York friends, acquaintances, and professional contacts directly at risk.

86. Although Zhang had returned to China, he had not abandoned the life or relationships he had built in the United States. Zhang maintained close friendships and personal and professional relationships here and remained in regular communication with those individuals. Gadson's publications therefore followed Zhang across an ocean and placed his reputation at risk among the very people whose friendship, trust, and respect he continued to value.

87. Gadson's accusations struck at the core of Zhang's character. They branded him as a violent domestic abuser, a strangler, a calculating liar who fabricated a police report, an unfaithful spouse, an immigration manipulator, and the beneficiary of international financial crime.

88. Those accusations exposed Zhang to public contempt, hatred, ridicule, aversion, and disgrace. They forced Zhang to confront the prospect that friends, acquaintances, and professional contacts would believe that he had committed serious acts of violence and dishonesty when, in fact, he had been Gadson's victim.

89. As a direct and proximate result of Gadson's publications, Zhang has suffered and continues to suffer substantial injury to his reputation, humiliation, shame, anxiety, emotional distress, mental anguish, and disruption of his personal and professional relationships. The continuing availability, circulation, and private sharing of the Videos have compounded those injuries.

90. Gadson published the challenged statements with actual knowledge of their falsity or, at minimum, with reckless disregard for whether they were true or false. His conduct was also motivated by common-law malice and a deliberate purpose to humiliate Zhang, retaliate against him, and destroy his reputation.

91.     The publications concerned a private dispute between former spouses. If the publications are nevertheless determined to concern an issue of public interest or to fall within New York Civil Rights Law § 76-a, Gadson published each challenged statement and defamatory implication with actual malice.

## FIRST CAUSE OF ACTION

### Assault

92.     Zhang repeats and realleges the paragraphs above as if fully set forth herein.

93.     Gadson intentionally engaged in a course of escalating and threatening conduct toward Zhang, including forcibly throwing household objects at him, pursuing the confrontation after Zhang attempted to retreat, overpowering and pinning Zhang to the floor, and threatening to kill him.

94.     Gadson's conduct placed Zhang in actual and reasonable apprehension that Gadson was about to inflict immediate harmful and offensive physical contact upon him. That apprehension was realized when Gadson pinned Zhang beneath him and pressed his fingers into Zhang's neck.

95.     Gadson intended to place Zhang in apprehension of such contact or, at minimum, knew with substantial certainty that his violent actions and death threat would do so.

96.     Zhang did not consent to Gadson's conduct, and Gadson had no lawful justification or privilege for it. Zhang repeatedly attempted to disengage and create distance between them, but Gadson continued and escalated the confrontation.

97.     As a direct and proximate result of Gadson's assault, Zhang feared for his life and suffered severe emotional distress, fear, anxiety, humiliation, mental anguish, and other injuries and damages in an amount to be determined at trial.

98.    Gadson committed the assault against Zhang while they were married and living together. The assault therefore arose from domestic violence committed by a family or household member and is timely under New York law.

99.    Gadson's conduct was intentional, malicious, willful, wanton, and undertaken with a conscious and reckless disregard for Zhang's rights and safety, entitling Zhang to an award of punitive damages

## SECOND CAUSE OF ACTION

### Battery

100.    Zhang repeats and realleges the paragraphs above as though fully set forth herein.

101.    Gadson intentionally made harmful and offensive physical contact with Zhang by overpowering him, forcing him to the floor, pinning him beneath Gadson's body, and pressing his fingers into Zhang's neck.

102.    Gadson intended to make that contact. The contact was deliberate, unwanted, and offensive to a reasonable sense of personal dignity, and it caused Zhang physical injury.

103.    Zhang did not consent to any of Gadson's physical contact. Gadson had no lawful justification or privilege for touching, restraining, or using force against Zhang.

104.    As a direct and proximate result of Gadson's battery, Zhang suffered immense neck pain, visible redness, multiple scratch wounds, fear, anxiety, humiliation, emotional distress, mental anguish, and other injuries and damages in an amount to be determined at trial.

105.    Gadson committed the battery against Zhang while they were married and living together. The battery therefore arose from domestic violence committed by a family or household member and is timely under New York law.

106.    Gadson's violent conduct was intentional, malicious, willful, wanton, and undertaken with a conscious and reckless disregard for Zhang's bodily integrity, rights, and safety, entitling Zhang to an award of punitive damages.

### THIRD CAUSE OF ACTION

### Defamation Per Se

107.    Zhang repeats and realleges the paragraphs above as though fully set forth herein.

108.    On July 13, 2026, Gadson published the first Video through his public Instagram account, @akadaydaygadson. After that publication was removed or taken down, Gadson separately republished the same Video through the same account on August 10, 2026. On August 12, 2026, Gadson published the Second Video, in which he repeated and elaborated upon his accusations against Zhang.

109.    In the first Video, Gadson falsely stated, among other things, that Zhang had strangled and physically assaulted him; that Zhang had called the police while falsely claiming that Gadson had attacked him; that Zhang possessed "dirty money" obtained from his father; that Zhang's father had laundered government funds; and that Zhang had fled the United States because of his involvement with those illicit funds.

110.    Gadson also falsely stated that Zhang used different names as deceptive "personas," lied about his identity and family, and cheated on Gadson. In context, those statements portrayed Zhang as violent, dishonest, manipulative, and involved in serious criminal activity.

111.    In the Second Video, Gadson again falsely accused Zhang of strangling and choking him. Gadson further accused Zhang of devising a "premeditated" scheme to make a false police report and frame Gadson for an assault that Gadson supposedly had not committed.

112. Gadson also falsely stated in the Second Video that Zhang had cheated "throughout the marriage," initiated a physical confrontation with Gadson, threw objects and furniture at Gadson, damaged Gadson's property, harmed Gadson's turtles, staged cries for help, forced his way into a room, and choked Gadson while positioned on top of him.

113. The challenged statements in both Videos were of and concerning Zhang. Gadson identified their subject as his former husband, displayed Zhang's image or likeness, used a name substantially similar to Zhang's name, and supplied biographical details that made Zhang readily identifiable to persons who knew him and to other reasonable viewers.

114. Gadson published the challenged statements to third parties without privilege or authorization. The Videos were made available to Gadson's approximately 18,400 Instagram followers and to the broader public through Instagram's recommendation, sharing, resharing, and direct-send functions.

115. The challenged statements were recorded and fixed in video form, accompanied by visual captions, and disseminated through a public social-media platform. They therefore constituted libel.

116. The challenged statements were assertions of existing and verifiable facts. Gadson claimed firsthand knowledge, supplied a purported chronology of specific events, attributed specific conduct and motives to Zhang, and represented that he was recounting events that had actually occurred. Reasonable viewers understood the statements as factual accusations, not opinion, rhetorical hyperbole, or speculation.

117. The challenged statements were false and were not substantially true. Zhang did not strangle, choke, assault, or otherwise attack Gadson; did not devise a scheme to make a false police report; did not stage his cries for help; did not destroy Gadson's property or harm his

turtles; did not possess or receive criminally laundered funds; and did not leave the United States to evade accountability for financial crimes.

118. Gadson knew that these accusations were false. Gadson personally participated in the April 4, 2025 confrontation and knew that he—not Zhang—had initiated and escalated the violence. Gadson knew that Zhang contacted the police because Gadson had attacked him, that officers documented Zhang's injuries, that Gadson was criminally charged following the incident, and that the Queens Criminal Court issued an order of protection naming Zhang as the protected party.

119. Gadson nevertheless inverted the parties' roles and accused Zhang of committing the same kind of violence that Gadson had inflicted upon him. Gadson's firsthand knowledge of the underlying events establishes that his accusations were not the product of mistake, confusion, or reliance upon inaccurate information.

120. Gadson's knowledge and malice are further demonstrated by his repeated publication of the accusations. After the July 13, 2026 publication was removed or taken down, Gadson deliberately republished it on August 10, 2026. Two days later, while that republication was attracting widespread attention, Gadson published the Second Video and supplied an even more elaborate version of the same false narrative.

121. Gadson therefore published each challenged statement with actual knowledge of its falsity or, at minimum, with reckless disregard for whether it was true or false. Gadson also acted with common-law malice and with the deliberate purpose of humiliating Zhang, retaliating against him, and damaging his reputation.

122. The challenged statements accused Zhang of strangulation, choking, physical assault, deliberately fabricating a report of domestic violence, framing Gadson for a crime,

knowingly possessing or benefiting from criminal proceeds, and fleeing the country to evade accountability for financial crimes. These accusations charged Zhang with serious criminal conduct and constitute defamation per se under New York law.

123. Because the statements constitute defamation per se, injury to Zhang's reputation and general damages are presumed, and Zhang is not required to plead or prove special damages as a condition of recovery.

124. The defamatory publications were disseminated on an extraordinary scale. By 5:00 p.m. on August 12, 2026, the August 10 republication had accumulated at least approximately 181,000 views, nearly 9,000 likes, 629 comments, 484 reshares, and 6,305 direct sends. Within hours of its publication, the Second Video had received at least 689 likes, 81 comments, 20 reshares, and 261 direct sends.

125. As a direct and proximate result of Gadson's defamatory publications, Zhang has suffered and continues to suffer presumed and actual injury to his reputation, humiliation, shame, anxiety, emotional distress, mental anguish, and disruption of his personal and professional relationships, together with other damages in an amount to be determined at trial.

126. Gadson's knowing fabrication, deliberate reversal of the parties' roles, repeated publication, and calculated dissemination of the accusations were malicious, willful, wanton, and undertaken with conscious disregard for Zhang's rights, entitling Zhang to punitive damages.

## FOURTH CAUSE OF ACTION

### Defamation by Implication

127. Zhang repeats and realleges the paragraphs above as though fully set forth herein.

128. This cause of action is pleaded in the alternative to the extent that any challenged statement is determined not to be independently actionable when considered in isolation, or is

determined to contain a fragment of literal truth while nevertheless conveying a materially false and defamatory meaning.

129.    The Videos must be considered in their entirety, including the order in which Gadson presented his accusations, the statements he juxtaposed, the material facts he omitted, the accompanying images and captions, and his repeated representation that he was presenting a truthful account based upon firsthand knowledge.

130.    In the first Video, Gadson stated that Zhang "called the cops on me claiming I attacked him" immediately after accusing Zhang of strangling him. By placing those assertions together, Gadson conveyed the defamatory implication that Zhang was the actual aggressor and had fabricated a domestic-violence report to frame Gadson and conceal Zhang's own supposed abuse.

131.    That implication was false. Zhang contacted the police because Gadson had thrown objects at him, overpowered him, pinned him to the floor, threatened to kill him, and pressed his fingers into Zhang's neck. The responding officers documented Zhang's injuries, Gadson was criminally charged following the incident, and the Queens Criminal Court issued an order of protection naming Zhang as the protected party.

132.    Gadson also stated that Zhang had "fled the country because he had dirty money from his father," whom Gadson accused of laundering government funds. By directly linking Zhang's departure from the United States to supposed criminal proceeds, Gadson conveyed the defamatory implication that Zhang knowingly possessed laundered money and returned to China to conceal his crimes or evade legal accountability.

133.    Although Zhang returned to China, he did not flee from law enforcement or financial accountability. Zhang returned to China after Gadson attacked him, threatened his life,

forced him to seek police and judicial protection, and caused the final breakdown of their marriage.

134.    Gadson reinforced those implications by accusing Zhang of using different names depending upon the "persona" he wished to present, lying about his identity and family, cheating on Gadson, and serving divorce papers that supposedly violated the parties' prenuptial agreement. Taken together, those accusations portrayed Zhang as a violent and calculating fraud who had concealed his identity, manipulated Gadson, deceived the police and courts, and fled the country after benefiting from criminal proceeds.

135.    In the Second Video, Gadson again accused Zhang of strangling him and characterized Zhang's decision to contact the police as part of a "premeditated" scheme. Gadson then presented a selective and fabricated chronology in which Zhang supposedly staged cries for help, damaged property, harmed Gadson's turtles, initiated a physical struggle, and positioned himself as the victim only after attacking Gadson.

136.    By arranging those accusations into a purported factual chronology, Gadson conveyed the defamatory implication that Zhang had planned and executed an elaborate scheme to provoke or fabricate a domestic-violence incident, falsely accuse Gadson, and manipulate the resulting police and judicial proceedings.

137.    Gadson's statements concerning Zhang's immigration status conveyed an additional defamatory implication. Gadson stated that he had refrained from divorcing Zhang because doing so would "revoke his green card" and because Gadson did not want to "ruin his life." In the context of Gadson's accompanying accusations of deception, infidelity, and abuse, those statements implied that Zhang had used Gadson and the parties' marriage to obtain or preserve an immigration benefit.

138.    That implication was false. Zhang did not enter into or remain in the marriage as part of an immigration scheme and did not manipulate Gadson to obtain or preserve lawful immigration status.

139.    The Videos reasonably conveyed these defamatory implications to ordinary viewers. Gadson also intended and endorsed the implications: he personally selected and arranged the accusations, presented them as a coherent factual narrative, claimed firsthand knowledge, omitted the facts showing that he had attacked Zhang, and continued the narrative through a multipart series.

140.    The defamatory implications were of and concerning Zhang and were published without privilege or authorization to Gadson's followers and the general public on July 13, 2026, through the republication on August 10, 2026, and through the Second Video on August 12, 2026.

141.    Each defamatory implication was false. Gadson knew it was false because he personally participated in the underlying events and knew that he had initiated and escalated the violence; that Zhang called for help and contacted the police because Gadson had attacked him; that Zhang was the protected party in the resulting criminal proceeding; and that Zhang's return to China was unrelated to financial crime or flight from legal accountability.

142.    Gadson therefore published the defamatory implications with actual knowledge of their falsity or, at minimum, with reckless disregard for whether they were true or false. Gadson also acted with common-law malice and with the deliberate purpose of humiliating Zhang, retaliating against him, and damaging his reputation.

143.    The defamatory implications accused Zhang of domestic violence, strangulation, fabrication of a police report, framing another person for a crime, immigration fraud, knowing

possession of criminal proceeds, concealment of his identity, and flight to evade legal accountability. To the extent they charge Zhang with serious criminal conduct, those implications constitute defamation per se.

144.    As a direct and proximate result of Gadson's publications, Zhang has suffered and continues to suffer presumed and actual injury to his reputation, humiliation, shame, anxiety, emotional distress, mental anguish, and disruption of his personal and professional relationships, together with other damages in an amount to be determined at trial.

145.    Gadson's knowing fabrication, deliberate omission of the true events, repeated publication, and dissemination of the defamatory implications to a vast audience were malicious, willful, wanton, and undertaken with conscious disregard for Zhang's rights, entitling Zhang to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Yuge Zhang respectfully requests that the Court enter judgment in his favor and against Defendant Dalon Gadson and award the following relief:

A.  Compensatory damages arising from Gadson's assault and battery, including damages for Zhang's physical pain and injuries, fear, anxiety, humiliation, emotional distress, and mental anguish, in an amount to be determined at trial;

B.  Presumed, general, and actual damages arising from Gadson's defamatory publications, including damages for injury to Zhang's reputation, humiliation, shame, emotional distress, mental anguish, and disruption of his personal and professional relationships, in an amount to be determined at trial;

C.  Compensatory damages on all causes of action, without duplication, in an amount exceeding $100,000, exclusive of interest and costs;

D.  Punitive damages in an amount sufficient to punish Gadson for his malicious, willful, and wanton conduct and to deter Gadson and others from engaging in similar misconduct;

E.  Prejudgment and post-judgment interest to the fullest extent permitted by law;

F.  Costs and disbursements incurred in this action; and

G.  Such other and further legal or equitable relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: New York, New York
      August 13, 2026

Respectfully submitted,
DGW Kramer LLP


By:    /s/ Jacob Chen
Jacob Chen, Esq.
Attorneys for Yuge Zhang
45 Rockefeller Plaza, 20th Floor
New York, New York, 10111
E-mail: jchen@dgwllp.com